**YALE UNIVERSITY**

v.

**FISK UNIVERSITY.**

No. 82–3158.

United States District Court,
M.D. Tennessee,
Nashville Division.

Oct. 1, 1985.

Thomas Peebles, III, Andree K. Blumstein, Trabue, Sturdivant & DeWitt, Nashville, Tenn., for plaintiff.

Charles H. Warfield, Farris, Warfield and Kanaday, Nashville, Tenn., for defendant.

## MEMORANDUM

HIGGINS, District Judge.

This diversity action was brought by the plaintiff, Yale University, against the defendant, Fisk University, on February 19, 1982, to recover from the possession of Fisk University certain literary manuscripts, letters, notes, other papers, and memorabilia known as the Jean Toomer Collection. Yale University also seeks a declaration that it is the sole owner of the Jean Toomer Collection and the literary rights therein, which were conveyed to it by Marjorie Content Toomer, Jean Toomer's widow, and Margery Toomer Latimer, Jean Toomer's daughter by a former marriage. This action was tried by the Court without the intervention of a jury from June 12 to June 18, 1985. For the reasons set forth in this memorandum, the Court finds in favor of the plaintiff, Yale University.

Yale University is an educational corporation duly chartered and existing under the laws of the State of Connecticut, with its principal place of business in New Haven, Connecticut. Fisk University is an educational corporation duly chartered and existing under the laws of the State of Tennessee, with its principal place of business in Nashville, Tennessee. As of the date of commencement of this action, the value of the Jean Toomer Collection exceeded $10,000. This Court has jurisdiction over this action under 28 U.S.C. § 1332.

Jean Toomer, who was born in 1894, was the author of *Cane,* a work of fiction first published in 1923 by the Liveright Publishing Corporation. Prior to December, 1962, Jean Toomer owned the Toomer Collection, which was situated at the Toomer residence in Doylestown, Pennsylvania. Since 1955, Jean Toomer had been in ill health and declined gradually over the years so that in and around October, 1962, he was in and out of nursing homes, and unable physically to sort through his disorganized manuscripts.

From 1943 to 1965, Dr. Arna Bontemps was employed by Fisk University as head librarian. For two or three years prior to September, 1962, Dr. Bontemps had been trying to locate Jean Toomer, because he sensed a revival of interest in Toomer and his writings. Dr. Bontemps wrote a letter dated December 8, 1959, to Jean Toomer, which went unanswered. Dr. Bontemps then began a correspondence with Jean Toomer's wife, Marjorie Content Toomer, in September, 1962. Neither Mr. nor Mrs. Toomer had any connection with Fisk University prior to September, 1962. Before September, 1962, Mrs. Toomer had not heard of Fisk University. Neither Mr. nor Mrs. Toomer ever visited the Fisk campus. Dr. Bontemps had authority on behalf of Fisk University to accept gifts or loans made to the Fisk University library.

In a letter dated October 4, 1962, Dr. Bontemps expressed to Mrs. Toomer an intense interest in the Toomer Collection, offering either to visit Doylestown to inspect the collection, or to pay for the collection to be sent to Fisk for handling. Dr. Bontemps did not solicit the Toomer Collection expressly as a gift or a donation to Fisk University. On October 12, 1962, Mrs. Toomer responded by reporting to Dr. Bontemps that she had "been trying from time to time to get Jean's consent to giving

his manuscript and correspondence to Fisk University library. Today he consented; in return I promised that he would not be asked to do anything about it." Mrs. Toomer shipped the major portion of the Toomer Collection to Fisk University in December, 1962, and the major portion of the collection arrived on December 18, 1962. Fisk University bore the cost of packing and shipping the collection, which totaled $71.29. In a deposition given in this action, Mrs. Toomer [1] stated that she was "innocent of the legal implications" of the 1962 letter and intended no legal significance by her use of the word "giving" in the letter.

At the time that the Toomer papers were transferred to Fisk, neither Dr. Bontemps nor Fisk University interpreted Mrs. Toomer's letter of October 12, 1962, to mean that the Toomer Collection was donated to Fisk as an outright gift. It was the policy of Fisk University, known to Dr. Bontemps, that the president of the University personally acknowledge gifts of significance made to Fisk. In addition, it was the custom and routine practice of Dr. Bontemps to acknowledge gifts to the Fisk library with a specially printed gift acknowledgment form, and to send a personal letter of thanks in addition to the printed gift acknowledgment form in the case of valuable or significant gifts to the Fisk library. Although Dr. Bontemps considered the Toomer Collection to be of special value and interest, and informed President Wright of Fisk that the collection was being sent to Fisk, neither Dr. Bontemps nor any other agent or employee of Fisk University ever sent an acknowledgment of gift form, nor was any letter ever sent to Jean Toomer, Marjorie Content Toomer, or Margery Toomer Latimer to express thanks for, or acknowledgment of, the Toomer Collection as a gift. Fisk does not have an instru-

ment or document purporting to be a "deed of gift" drawn for the express purpose of transferring ownership in the Jean Toomer Collection to Fisk. Apparently, and the Court so finds, the only clear understanding among the parties to the transfer was that the collection would be placed at Fisk for the use of Dr. Bontemps, and that Fisk would attempt to order and arrange the papers.

The Toomer Collection has remained in the custody of Fisk University from December 18, 1962, to the present, with the exception of a period of time between 1968 and January, 1970, when the collection was under the curatorship of Clifton Johnson at the Amistad Research Center, which was located on the Fisk campus, but which was not part of Fisk University. Nevertheless, at no time between December 18, 1962, and November 30, 1981, did the Toomers understand Fisk to be claiming ownership of the collection or the literary rights therein. In terms of legal status, the Fisk library distinguishes between manuscript collections that have been donated to it, i.e., gifts, and manuscript collections that have come to Fisk as loans, i.e., deposits. The former are owned outright by Fisk, while the latter are not owned by Fisk and may be withdrawn by the owner at any time.[2] Fisk's policy is, and has been since 1962, to obtain permission to copy or publish from the owners of manuscript collections on deposit before permitting researchers to copy or publish from papers in Fisk's custody.

During the entire time the Toomer Collection was housed at Fisk, at least up to the inception of this lawsuit, it was the routine and customary practice of Fisk to obtain Marjorie Content Toomer's permission before allowing scholars or researchers to copy or publish portions of the Toom-

1. Mrs. Toomer died in 1984.

2. "Deposit," "On Deposit," and "Deposited," when used in reference to manuscript collections, are technical terms used by librarians, including the librarian at Fisk, to mean that a particular collection is on loan to the library, as distinguished from a collection owned by the library as a result of a purchase or outright gift. After Dr. Jessie Carney Smith came to Fisk as head librarian in 1965, the Fisk library developed two separate forms, one for gifts and one for deposits, and used them as appropriate in any given case to document the legal status of the manuscripts collections held by Fisk. The deed of gift form and the special collection deposit agreement form jointly reflect the fact that Fisk accepted both loans and gifts of manuscript collections.

er Collection. This course of action was not a mere courtesy to the Toomers, but was followed because it was considered by Fisk to be a legal requirement to which it scrupulously adhered. While the Toomer Collection has been housed at Fisk, it was Fisk's practice and policy to consult Mrs. Toomer about library regulations pertaining to the collection and to implement Mrs. Toomer's requests and suggestions. Fisk consistently treated Jean Toomer, Marjorie Content Toomer and/or Margery Toomer Latimer as the owners of the Toomer Collection from December 18, 1962, until at least November 30, 1981, when Ms. Sheila Bell, then Fisk University counsel, in a letter to one of Yale's attorneys, William L. Harbison, first claimed that Fisk had title to the collection.

Dr. Bontemps also consistently treated the Toomer collection as "on deposit" with Fisk University. Dr. Bontemps led Mrs. Toomer to believe that he would, subject to her approval and permission, publish substantial portions of Jean Toomer's unpublished works, but he never was able to achieve this objective. On May 2, 1967, Dr. Bontemps advised Mrs. Toomer that hers "is surely the last word" on publication of all Jean Toomer's manuscripts, except *Cane*, the copyright to which was held by Liveright, and that there was no point in assigning the rights to others, himself included, because "these belong to you." On October 2, 1966, Dr. Bontemps wrote to Arthur Pell at Liveright Publishing Corporation, with a copy to Mrs. Toomer, stating that the collection is "deposited" at Fisk.

On June 26, 1967, Dr. Bontemps wrote to Mrs. Toomer asking her to let him see additional Toomer material before "depositing" it at Fisk. Dr. Bontemps and Langston Hughes co-edited an anthology, *The Poetry of the Negro, 1746–1970*, which was published in 1970 by Doubleday & Co., New York. On page 107 of the anthology, there is published a poem by Jean Toomer. The poem had not been published previously and was part of the Toomer Collection. The anthology contains a printed acknowledgment, also on page 107, that the poem is published "[b]y permission of Majorie Content Toomer." It was Dr. Bontemps' routine customary practice to seek the advice, approval, and permission of Mrs. Toomer before he allowed researchers and scholars, including himself, to copy or publish from the collection, and before he undertook any Toomer-related projects.

Dr. Bontemps stepped down as head librarian at Fisk University on or about July 1, 1965, and was succeeded by Dr. Jessie Carney Smith. Nevertheless, after Dr. Smith became head librarian, Dr. Bontemps continued to handle all matters involving the Toomer Collection for several years. After 1965, Dr. Bontemps remained in the employ of Fisk for several years as Director of Development, and continued to act in the capacity of librarian to the Toomer Collection and continued his relationship with Mrs. Toomer.[3]

Two memoranda written by Fisk personnel in 1969 during a controversy involving the Amistad Research Center[4] point to the conclusion that Fisk recognized at that

**3.** Dr. Bontemps died on June 4, 1973. In January and February, 1969, Dr. Bontemps was at Yale University and his address and telephone numbers, both at home and work, were known to Fisk.

**4.** In September, 1966, Clifton Johnson arrived at Fisk to begin working on the development of the Amistad Research Center. Pursuant to an agreement worked out between Fisk and Amistad, Amistad took custody of the manuscript collection owned by or deposited at Fisk under the same terms and conditions on which they were held by Fisk. That is, the manuscripts in Fisk's possession were deposited at Amistad, but Fisk retained whatever title or interest it originally had received in the manuscripts. Under the agreement, the Toomer Collection was trans-

ferred to Amistad in 1968, where the bulk of the processing work was done on the collection. In May and June, 1969, Clifton Johnson wrote to and visited Mrs. Toomer, and discussed with her the possibility of making a gift of the collection to Amistad. Through a conversation in May, 1969, with Marion Fuson, the wife of Fisk faculty member, Dr. Nelson Fuson, Dr. Smith learned of Dr. Johnson's contact with Mrs. Toomer. Dr. Smith was concerned that the Amistad Research Center would acquire superior title to the Toomer Collection and perhaps other collections through the efforts of Clifton Johnson. Dr. Bontemps had advised Dr. Jessie Smith to refrain from contacting the Toomers because it was a "delicate situation."

time that the Toomer Collection had been deposited, rather than given, to Fisk. On February 27, 1969, Dr. Smith wrote a memorandum to President Lawson of Fisk University expressing her concern that Amistad was trying to acquire title to Fisk manuscript collections, and urging the administration to require Amistad to return the manuscript collection in question to Fisk's custody. In that memorandum, Dr. Smith states that the Toomer collection is on deposit in the library, but owned by the Toomer family. She recommends that the University refrain from contacting the Toomers because of the "delicate situation" resulting from the personal relationship established between Dr. Bontemps and the Toomers. Although Dr. Smith claims that she is unable to recall how she got the information contained in the memorandum of February 27, 1969, she recalls that she did research to ascertain the facts stated in her memorandum.[5] An earlier January 22, 1969, memorandum contains essentially the same information about the legal status of the Toomer Collection at Fisk as is contained in Dr. Smith's February 27, 1969, memorandum to President Lawson, as well as Dr. Bontemps' New Haven address and telephone numbers. Dr. Smith admitted that she *may* have discussed with Dr. Bontemps the origin and status of the Toomer Collection, that the January 22, 1969, memorandum *may* be a recording of what Dr. Bontemps told her, and that she *may* have authored the memorandum. All other persons at Fisk who could theoretically have had something to do with the January 22, 1969, memorandum categorically denied authorship and other involvement with it. The January 22, 1969, memorandum contains the kind of information Dr. Smith was seeking in preparation of her February 27, 1969, memorandum, and Dr. Bontemps was the only person connected with Fisk who possessed that information. The Court finds that it is more probable than not that Dr. Smith learned from Dr. Bontemps that the Toomer Collection was on deposit at Fisk, and that Dr. Smith authored the January 22, 1969, memorandum based on information she received from direct inquiry to Dr. Bontemps.[6] On May 23, 1969, Dr. Smith, in a letter that represents her first contact with Mrs. Toomer, expresses her hope that Mrs. Toomer would "consent to have the Toomer papers remain a vital part of the Fisk University library," thus apparently recognizing that Mrs. Toomer had the right to withdraw the collection from Fisk.[7]

During the course of the Fisk-Amistad controversy, Clifton Johnson of Amistad, unable to find records pertaining to the acquisition of the Toomer Collection, inquired of Mrs. Toomer in May of 1969 as to the conditions under which the collection was placed at Fisk. In a letter written that month, Mrs. Toomer wrote to Mrs. Fuson, wife of a Fisk faculty member, stating, "Mr. Johnson's letter indicates that he is ignorant of the conditions under which I sent Jean's papers to Fisk—He is no more ignorant than I am! There were no conditions!" In June, 1969, Mrs. Toomer wrote Dr. Smith, the Fisk librarian, that "Jean Toomer's papers were sent originally to Fisk University library without any conditions, stipulations, strings, or what-have-you because of Arna Bontemps' urgent desire to have them, and because I couldn't possibly put any order into them. How-

---

5. The February 27, 1969, memorandum was not produced by Fisk to Yale until March 24, 1983, shortly before Yale deposed Dr. Smith for the second time. The Court expressly exonerates Mr. Warfield and his law firm, as trial counsel, and Ms. Sheila Bell as, in-house counsel, for Fisk of any implications of involvement in what the Court is convinced was a deliberate effort on the part of one or more employees of Fisk to suppress this document called for during the discovery process. For the background of the serious implications surrounding the production of this critical document, reference is made to the transcript of the hearing in Chambers (document No. 47 in the record).

6. The Court finds Dr. Smith's testimony concerning her failure of recollection about the preparation of the January 22, 1969, memorandum to be incomprehensible and simply does not credit her explanation or lack of explanation.

7. The Amistad Research Center moved from the Fisk campus to New Orleans in January, 1970, after returning the Toomer Collection to the custody of Fisk.

ever, if your Trustees wish to house them in another building, who am I to stand in their way? It is still all Fisk." Dr. Smith responded, "since they were originally given to the Fisk library without conditions, we will continue to consider them Fisk property." Although these letters, read alone, might indicate a belief by Mrs. Toomer that her husband intended to give his collection as a gift, the context in which the documents were generated shows that references to title are to title only as between Fisk and Amistad. These letters were never interpreted by Fisk to mean that the Toomer Collection was owned by Fisk until on or after November 30, 1981, when Fisk first advised Yale that it was asserting ownership of the collection.

From September, 1969, to the present, Ann Allen Shockley has been employed by Fisk University as associate librarian and special collections librarian or head of the special collections department of the Fisk library. After her arrival at Fisk, Ms. Shockley was charged with documenting the legal status of the various manuscript collections at Fisk, including the Toomer Collection. Ms. Shockley has executed numerous deeds of gift and special collection deposit agreements on behalf of Fisk since her arrival at the University. From 1969 on, Ms. Shockley treated the Toomer Collection as being on deposit at Fisk more probably than not because she knew that Dr. Bontemps had treated the collection in this manner. Ms. Shockley also consulted with Dr. Jessie Smith concerning the deposit of the Toomer Collection.

On April 22, 1971, Ms. Shockley sent Mrs. Toomer a special collections deposit agreement for her signature. Ms. Shockley's letter of transmittal shows that Dr. Smith, head librarian, was sent a copy of the correspondence. Mrs. Toomer executed the agreement on April 26, 1971, and Ms. Shockley executed the agreement on May 10, 1971, on behalf of Fisk. Fisk furnished Mrs. Toomer with a fully executed copy of the April-May, 1971, deposit agreement. Dr. Smith and Ms. Shockley had authority to execute the deposit agree-

ment on behalf of Fisk, and to accept loans or gifts to the library on behalf of the University. The Court finds that the deposit agreement formalized the deposit status of the collection at Fisk and formally documented the understanding that had existed between the Toomers and Fisk since 1962.[8]

In February, 1979, Sheila Trice Bell became University legal counsel at Fisk. The library began at that time referring requests to copy or publish from its manuscript collections to Ms. Bell. In September, 1979, in order to discharge her duties concerning permission to publish or copy from the Toomer Collection, Ms. Bell investigated and learned with "the help of Dr. Jessie Smith and the librarians who directly administer special collections ... that Fisk owns no part of the [Toomer] collection and that the entire collection is owned by Mrs. Marjorie Content Toomer...."

On February 24, 1980, Mrs. Toomer first notified Fisk of her intention to donate the Toomer Collection to Yale and to exercise her rights under the deposit agreement. Mrs. Toomer's reasons for removing the collection from Fisk and donating it to Yale were: (1) greater accessibility of the collection at Yale; (2) the fact that several Yale Afro-American studies professors had a book contract to publish Toomer's unpublished works; (3) the presence of a Toomer protege at Yale; and, (4) the fact that the manuscript collections of many of Toomer's literary contemporaries were at Yale. On December 23, 1980, Ms. Bell advised Yale's general counsel that she had "investigated this matter to some considerable extent" and notified Yale and other third parties that Mrs. Toomer owned the collection, that Fisk owned no part of it, and that Fisk had treated Mrs. Toomer as heir to her husband's papers. Ms. Bell reported this to the Fisk Board of Trust, and the Fisk administration acquiesced in this position.

Fisk's library card catalog for the Toomer Collection states that the collection was deposited at Fisk. Fisk supplied a data sheet to the National Union Catalog of Manuscript Collections (Library of Con-

---

**8.** From January, 1971, to June, 1971, Dr. Bon-

temps maintained a residence in Nashville.

gress) stating that the Toomer Collection was on deposit. This information supplied by Fisk—i.e., the statement that the Toomer Collection is on deposit—is published in the National Union Catalog of Manuscript Collections (NUCMC), which is widely distributed to libraries and other institutions. Also, in the June, 1972, issue of the Fisk publication "BANC!," the Toomer Collection was declared as being on deposit at Fisk. Dr. Bontemps was a contributor to the June, 1972, "BANC!," which was dedicated to Jean Toomer, and Dr. Bontemps received a copy of the issue, as did Mrs. Toomer. At this time, Dr. Bontemps was in the employ of Fisk as a writer-in-residence.

On November 30, 1981, Ms. Bell informed one of the attorneys for Yale, William L. Harbison, that Fisk claimed title to the collection. By an instrument dated April 29, 1983, Mrs. Toomer effected the assignment to Yale of all her rights under the deposit agreement, which assignment was accepted by Yale. The deeds of gift executed by Marjorie Content Toomer and Margery Toomer Latimer was duly delivered to and accepted by Yale. Fisk does not dispute that the deeds of gift constitutes a valid and effective transfer to Yale University of whatever interest Mrs. Toomer and Mrs. Latimer had in the Toomer Collection and the literary rights therein.

Marjorie Content Toomer, her attorney, Harold Vikoren, and Yale University, have each requested Fisk in writing, as required under the terms of the deposit agreement, that the Toomer Collection be surrendered and transferred to Yale.

The Court concludes that Pennsylvania law governs the issue of the purported gift to Fisk in 1962.

■ Under Pennsylvania law, the essential elements of a valid inter vivos gift are an intention to make an immediate gift and an actual or constructive delivery to the donee as will divest the donor of dominion and control over the subject matter of the gift. *Hengst v. Hengst*, 491 Pa. 120,

420 A.2d 370, 371 (1980). It is the duty of the donee to establish these elements by clear, precise, direct, and convincing evidence. *In Re: Clark's Estate*, 467 Pa. 628, 359 A.2d 777, 780 (1976).

The Court concludes that Fisk University has not carried its burden of establishing that Jean Toomer intended to make a gift, that he relinquished all dominion and control over the subject matter of the gift, or that the gift was accepted by the purported donee as a gift.

■ The Court simply does not believe that the 1962 letter from Marjorie Content Toomer constitutes the requisite clear evidence of a donative intent on the part of Jean Toomer, in light of all of the facts and circumstances surrounding the letter, and in light of Mrs. Toomer's own statements and the actions of Fisk personnel concerning the letter. Among the many facts that the Court has taken into account in concluding that there was a lack of donative intent are: (1) Mrs. Toomer's own statements that she was "innocent of the legal implications" of the letter and intended no legal significance to the letter; (2) Fisk's action in routinely consulting Mrs. Toomer concerning the use of the papers and Fisk's failure to send a gift acknowledgment; (3) the fact that there was no clear statement by Dr. Bontemps that the papers were a gift; (4) Fisk's listing of the papers as on deposit in the library catalog; (5) the two highly significant 1969 memoranda which the Court finds to have been written by Dr. Smith concerning the origins of the papers; and, (6) the 1971 deposit agreement by Fisk. Nor is the Court convinced that any of the other evidence in the record constitutes the requisite clear evidence of gift.[9]

The deeds of gift from Marjorie Content Toomer and Margery Toomer Latimer (as Jean Toomer's heirs and/or next of kin) are valid and effective to transfer to Yale University their rights, title and interest in the Toomer Collection. Yale has met its burden of proof that Mrs. Toomer and Mrs.

---

9. As noted earlier, the 1969 letter by Mrs. Toomer stating that there are "no conditions" must be read in light of the Fisk-Amistad controversy.

Latimer made a completed inter vivos gift of the Toomer Collection to Yale.[10]

The Court, therefore, finds that Yale University is the owner of the Toomer Collection and the literary rights therein, which were expressly conveyed to it by Marjorie Content Toomer and Margery Toomer Latimer by deeds of gift.

An appropriate order will be entered declaring that Yale University is the sole owner of the Toomer Collection and the literary rights pertaining thereto, and requiring Fisk University to transfer the Toomer Collection to Yale University.[11]

---

**10.** In light of the Court's conclusion that no gift was made to Fisk in 1962, the Court need not reach Yale's alternative contentions that Fisk was in breach of the 1971 deposit agreement, or that Fisk was estopped by its conduct to claim ownership of the Toomer papers.

**11.** Yale's complaint requested damages for loss of use of the Toomer Collection. This claim has apparently been abandoned. In any event, no proof of damages was presented at trial.